IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FT. SMITH DIVISION


JESSICA LYNN CHILDRES                                        PLAINTIFF

V.                                    NO. 11-2077

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration           DEFENDANT


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**


Plaintiff, Jessica Lynn Childres, brings this action pursuant to 42 U.S.C. § 405(g),

seeking judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying her claim for supplemental security income (SSI) under the provisions

of Title XVI of the Social Security Act (Act).  In this judicial review, the Court must determine

whether there is substantial evidence in the administrative record to support the Commissioner's

decision.  See 42 U.S.C. § 405(g).

**I.      Procedural Background:**

Plaintiff protectively filed her application for SSI on June 18, 2007, alleging an inability

to work due to "mild retardation, learning disabilities-adhd." (Tr. 133, 149).  An administrative

hearing was held on March 23, 2009, at which Plaintiff appeared with counsel, and she and her

mother testified.  (Tr. 11-42).

By written decision dated June 23, 2009, the ALJ found Plaintiff had the following severe

impairments: mood disorder, borderline intellectual functioning; and attention deficit hyperactivity disorder (ADHD). (Tr. 58). However, after reviewing all of the evidence presented, he determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 58). The ALJ found that Plaintiff had no exertional limitations, and could perform unskilled work where interpersonal contact was incidental to the work performed. (Tr. 60). With the help of a vocational expert (VE), the ALJ determined Plaintiff would be capable of performing past relevant work as a housekeeper and food prep worker. (Tr. 62).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on March 4, 2011. (Tr. 4-6). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have filed briefs and this case is before the undersigned for report and recommendation. (Docs. 5, 7).

## II.    Evidence Presented:

Plaintiff was born in 1984, completed the 9th grade in school,[1] and lives with her mother. (Tr. 17, 25, 133, 153). Plaintiff repeated the 1st and 9th grade in school and attended special education classes. (Tr. 229). At the hearing before the ALJ, Plaintiff testified that she tried to get her GED but "got bored of it." (Tr. 17).

A Psychological Evaluation dated May 12, 1999, by Susan Kane-Ronning, Ph.D., reflects that when Plaintiff was 15 years of age, she was given IQ scores as follows: Verbal IQ - 59; Performance IQ - 72; and Full Scale IQ - 63. (Tr. 267).

---

[1] Although Plaintiff indicated she completed the 11th grade in an Undated Disability Report - Adult, she indicated at the hearing that her mother said she stopped going to school in the 9th grade. (Tr. 17).

The next record in the transcript is dated January 17, 2006, when Plaintiff presented herself to Lane Regional Medical Center with an earache. (Tr. 213). It was noted that at that time, Plaintiff's behavior pattern was appropriate for her age, gender and circumstance; that her appearance was normal; that she had normal thought processes; and there were no acute findings regarding her emotional status. (Tr. 216). This was also found to be the case on June 21, 2006, when Plaintiff presented herself to Lane Regional Medical Center with numbness in her left arm and jaw, and a headache. (Tr. 218-221).

On August 15, 2007, Patricia J. Walz, Ph.D., of Consulting Psychology of Western Arkansas, Inc., evaluated Plaintiff. (Tr. 228-234). When asked why she had applied for Social Security benefits, Plaintiff said: "I really can't keep a job because I get mad at my boss and will quit. I have a hard time learning what they need me to learn and they'll end up firing me or putting me somewhere else where it's easier but it's not me and I'll quit. I've only been fired once." (Tr. 228). Although Plaintiff reported taking Paxil, Ritalin, Adderal, and Dexedrine in the past, she told Dr. Walz that she was not taking medication at that time because she had no money. (Tr. 229). Plaintiff was reported as being 2 ½ credits shy of graduating at the Job Corps, which she quit because her mother was moving. (Tr. 229). She also told Dr. Walz that she tried to get a GED, but it was too difficult, so she did not want to do it anymore. (Tr. 229).

Plaintiff worked for four months as a housekeeper at Washington Regional Hospital, and when Dr. Walz asked what happened to that job, Plaintiff said: "Honestly, I don't know. My boss told me that I wasn't doing something right and they fired me." (Tr. 230). Plaintiff further told Dr. Walz that she last worked in December of 2006 at a Mobil Station in Baton Rouge, Louisiana, and that she was there during the Christmas season. She said she was going to stay

AO72A
(Rev. 8/82)

longer but she moved to Georgia.  (Tr. 230).

Plaintiff advised Dr. Walz that she needed no assistance with her activities of daily living, and did some chores around the house.  (Tr. 230).  She also reported knowing how to cook and could make a complex meal.  (Tr. 230).  Dr. Walz found Plaintiff appeared to be open and honest in terms of her presentation and worked diligently on tasks.  (Tr. 231).  She also reported that Plaintiff was sometimes slow to respond during the testing and seemed to have poor frustration tolerance, and seemed overwhelmed when tasks were difficult for her, although she persisted. (Tr. 231).  Plaintiff's IQ scores at that time were: Verbal IQ - 73; Performance IQ - 76; Full Scale IQ - 72.  (Tr. 232).  Dr. Walz reported that diagnostic consideration would include Bipolar II Disorder vs. Cyclothymic Disorder,[2] and that based on her IQ scores, history of learning impairments, and impairment in home living, self care, and academic skills, she felt Plaintiff qualified for a diagnosis of Mild Mental Retardation.  (Tr. 232).  She diagnosed Plaintiff as follows:

|           |                                                 |
|-----------|-------------------------------------------------|
| Axis I:   | Bipolar II Disorder v. Cyclothymic Disorder     |
|           | Attention Deficit Hyperactivity Disorder        |
|           | History of Intermittent Substance Abuse         |
|           | Reportedly in Remission                         |
| Axis II:  | Mild Mental Retardation                         |
| Axis V:   | GAF - 45-50                                     |

(Tr. 232).  Dr. Walz found Plaintiff's social skills to be "fairly adequate" although she had an immature presentation, and that her speech was clear and intelligible.  (Tr. 233).  She found Plaintiff's intellectual functioning to be in the Mildly Mentally Retarded range and that she

---

[2]Cyclothymic disorder - A mood disorder characterized by numerous alternating short cycles of hypomanic and depressive periods with symptoms like those of manic and major depressive episodes but of lesser severity. Called also *cyclothymia*.  Dorland's Illustrated Medical Dictionary 556 (31st ed. 2007).

would not be able to understand, remember, or carry out complex instructions. (Tr. 233). She noted that Plaintiff was easily distractible and seemed overwhelmed by complex tasks. (Tr. 233). She found Plaintiff's cognitive functioning was average, and noted that the only inconsistency was that Plaintiff first said she had never been arrested, then later said she had gotten into legal trouble for drugs. (Tr. 233). Dr. Walz found that Plaintiff was not able to manage funds without assistance. (Tr. 234).

On November 19, 2007, a Mental Diagnostic Evaluation was performed by Kathleen M. Kralik, Ph.D. (Tr. 238-243). Dr. Kralik noted the Mental Diagnostic Examination from Dr. Walz dated August 15, 2007, "indicating measured Borderline intellectual functioning (but a diagnosis of mild MR assigned)." (Tr. 238). Plaintiff told Dr. Kralik that if she was at a job and depressed, and her boss said something to her, she would get up and leave. She would not say anything to him, but would just leave - "like if he was telling me I was doing something wrong." (Tr. 238). Plaintiff also said that there were times her mother would have certain things for her and her sister to do, and that if she was depressed, "I won't do it or forget about." (Tr. 238). Plaintiff acknowledged that a lot of this was a maturity issue, especially as she received no significant consequences for such behavior. (Tr. 238). Plaintiff described to Dr. Kralik a pattern of quitting jobs while always having someone else to support her between jobs, and described getting easily bored, easily irritated and frustrated, and manifested her significant problems with inattentiveness and difficulties persisting. (Tr. 238).

Plaintiff initially denied ever having received any mental health treatment, but later admitted she had seen "a few" counselors over the years. (Tr. 239). Plaintiff took no medications other than Tylenol, and appeared fairly content with her life as it was. (Tr. 239).

AO72A
(Rev. 8/82)

She said that she had tried staying with a job, but "I get bored." (Tr. 239). Plaintiff reported that she took offense when given feedback about her performance. (Tr. 239). Plaintiff also reported smoking one pack of cigarettes per day. (Tr. 239).

Dr. Kralik reported that Plaintiff seemed "more socially immature and inattentive than cognitively limited." (Tr. 240). Dr. Kralik found Plaintiff's thinking to be logical, organized, and goal-directed, and was estimated to function in the low average range of intelligence. (Tr. 240). She further found that Plaintiff's processing speed was good, but efficiency was problematic in association with her inattentiveness (more so than limited cognition). (Tr. 240). "While it is not doubted her measured intellectual functioning is lower than this estimate, her inattentiveness resulting in inaccuracies is a more likely explanation than inability to perform better." (Tr. 240). Based on Plaintiff's performance at the interview, her academic and occupational attainments, and general level of adaptive functioning, Dr. Kralik found that Plaintiff did not appear to be functioning within or near the mentally retarded range of functioning. (Tr. 241). She found Plaintiff's estimated IQ to be >80, and that it looked as if she functioned at a lower level due to inattentiveness and a tendency to give up fairly readily at times. (Tr. 241). Dr. Kralik found that the characteristics of ADHD seemed to be the prominent condition about which Plaintiff complained. (Tr. 241). Dr. Kralik diagnosed Plaintiff as follows:

| | |
|---|---|
| Axis I: | Attention Deficit Hyperactiveity Disorder, combined type |
| Axis II: | Diagnosis on Axis II deferred; narcissistic and dependent/parasitic features likely |
| Axis V: | Estimated Current GAF - 55-65 |
| | Estimated Highest GAF Past Year - 65-76 |
| | Estimated Typical GAF Past Year - 60-70 |

(Tr. 242).

Dr. Kralik found that Plaintiff's capacity to carry out activities of daily living and daily adaptive functioning was estimated to be somewhat impaired, but for the most part adequate for occupational purposes. (Tr. 242). She found that Plaintiff's capacity to communicate and interact in a socially adequate manner was estimated to be for the most part adequate for occupational purposes, and that Plaintiff acknowledged both maturity and authority issues as impacting occupational functionality. (Tr. 242). Dr. Kralik also found that Plaintiff's capacity to communicate in an intelligible and effective manner was estimated to be generally adequate for occupational purposes, and that inattentiveness may impact the accuracy of her performance, and that Plaintiff's capacity to cope with the typical mental/cognitive demands of basic work-like tasks seemed adequate for occupational purposes. (Tr. 242). Dr. Kralik reported that Plaintiff initially alleged poor frustration tolerance, but later amended that, stating that authority issues and/or boredom were more likely contributors to quitting jobs than any other type of disability or inability to function occupationally. (Tr. 242-243).

Dr. Kralik found that Plaintiff's ability to attend and sustain concentration on basic tasks seemed problematic. However, Dr. Kralik believed Plaintiff's inattentiveness, more than low cognition, learning impairments or mental illness, seemed to be the primary impediment to readily acquiring new learning and accurately completing tasks. (Tr. 243). Dr. Kralik also believed that Plaintiff's capacity to sustain persistence in completing tasks seemed problematic, but that she was essentially able to persist, but was disinclined to do so, "especially in light of her family's willingness to support her when she impulsively quit jobs without having another position lined up." (Tr. 243). Dr. Kralik reported that Plaintiff "was generally not being fired

-7-

from jobs, implying performance adequacy.  Rather, she would quit." (Tr. 243).  Overall, Dr.

Kralik found that while she did not doubt the measured psychoeducational assessment results,

"the pattern of performance claimant evidenced and described here is much more indicative of

the ongoing ADHD symptoms coupled with social maladjustment issues - more so than genuine

pervasive low cognitive functioning or any other form of mental illness." (Tr. 243).

On November 28, 2007, Dr. Kay M. Gale completed a Psychiatric Review Technique

form. (Tr. 244-257).  Dr. Gale reported that Plaintiff tested in the borderline range, and

concluded that Plaintiff had a moderate degree of limitation in restriction of activities of daily

living and in maintaining concentration, persistence, or pace, and had a mild degree of limitation

in difficulties in maintaining social functioning. (Tr. 248, 254).  Dr. Gale noted that Plaintiff had

a history of ADHD, with no current treatment, and that on a recent exam, she tested in the

borderline range. (Tr. 256).  She further reported that Plaintiff's adaptive functioning was not

clearly consistent with the medical records, and that the overall data supported borderline

intellectual functioning. (Tr. 256).  She reported that a possible mood disorder was noted on the

exam.  However, on a repeated exam this was not evident. (Tr. 256).  Dr. Gale noted that

Plaintiff's ADHD continued to be somewhat limiting, although not to the degree that it precluded

work. (Tr. 256).  She found that Plaintiff seemed capable of unskilled work. (Tr. 256).

In a Mental RFC Assessment dated November 28, 2007, Dr. Gale found that Plaintiff was

moderately limited in 5 out of 20 categories, and was not significantly limited in 15 out of 20

categories. (Tr. 258).  She further found that Plaintiff was able to perform work "where

interpersonal contact is incidental to the work performed, e.g. assembly work; complexity of

tasks is learned and performed by rote, with few variables, uses little judgment; supervision

-8-

required is simple, direct and concrete.  Unskilled work." (Tr. 260).

At the hearing before the ALJ, Plaintiff testified that she had a driver's license with no restrictions, and had no problems driving. (Tr. 28).  She further testified that when her mother gave her a list of items to get at Wal-Mart, she had to call her to make sure she got everything right. (Tr. 25).  She stated that she watched "teen shows" and hung out with her friend. (Tr. 26).  Plaintiff's mother testified that Plaintiff could not finish a task, and could not remember to do the same thing over and over.  (Tr. 31).  She also testified that Plaintiff could function independently, but that she would need help paying her bills. (Tr. 32).  She stated that Plaintiff could bathe and clean house, and would go see her disabled grandmother, who lived close by, and vacuum for her "and stuff like that." (Tr. 33, 36).

## III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the

AO72A
(Rev. 8/82)

ALJ must be affirmed.  Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§423(d)(3), 1382(3)(D).  A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing her claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given her age, education, and experience.  See 20 C.F.R. §416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity (RFC).  See McCoy v. Schneider, 683 F.2d 1138, 1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

-10-

IV.     **Discussion:**

        **A. Impairments:**

        Plaintiff contends that the Commissioner's decision should be reversed because her

condition meets Listing 12.05C.

        In order to show that Plaintiff meets or medically equals all of the requirements of Listing

12.05C, she must prove that she has:

> 12.05 Mental Retardation: Mental retardation refers to significantly
> subaverage general intellectual functioning with deficits in adaptive
> functioning initially manifested during the developmental period; i.e., the
> evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the
> requirements of A, B, C, or D are satisfied.
> A.  Mental incapacity evidenced by dependence upon others for personal
> needs (e.g., toileting, eating, dressing, or bathing) and inability to follow
> directions, such that the use of standardized measures of intellectual
> functioning is precluded;
> OR
> B.  A valid verbal, performance, or full scale IQ of 59 or less;
> OR
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a
> physical or other mental impairment imposing an additional and
> significant work-related limitation of function;
> OR
> D. [not applicable]

20 C.F.R. Pt. 404, Subpt. P, App 1 § 12.05.

        The Court will first address the initial requirement of 12.05, which requires significantly

subaverage general intellectual functioning, with deficits in adaptive functioning initially

manifested during the developmental period.  The evidence reveals that Plaintiff was able to

drive, spend time with family and friends, go swimming with her friend and play softball, read

(although she did not like to) and write, fill out job applications, clean house, work at a Mobil

-11-

station, and help her disabled grandmother. The record also revealed that Plaintiff often just "quit" her jobs because she would get bored, that she did not receive her GED because she would get bored, or that she did not do what her mother asked her to because she did not want to, or would forget. Plaintiff also indicated that she would have stayed longer at the Mobil Station in Baton Rouge, Louisiana, but moved to Georgia.

The Court believes the objective evidence of record, Plaintiff's past working history, and her extensive daily activities support a finding that Plaintiff's impairments did not meet or medically equal the diagnostic description in the introductory paragraph of Listing 12.05.

With respect to Plaintiff's IQ scores, Plaintiff specifically refers to her Verbal IQ score of 59 in 1999, when she was 15 years old, in support of her position that she meets a listing. However, as indicated above, in 2007, Dr. Walz found Plaintiff had a verbal IQ score of 73, and later in 2007, Dr. Kralik estimated Plaintiff's IQ score to be over 80.

> IQ test results must also be sufficiently current for accurate assessment under 112.05. Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior. IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above. IQ test results obtained before age 7 are current for 2 years if the tested IQ is less than 40 and 1 year if at 40 or above.

20 C.F.R. pt. 404, Subpt. P, App. 1, § 112.00(D)(10). Based upon the above, Plaintiff's IQ score of 59 when she was 15 years old is not a valid indication of her functioning during the relevant time period, when she was in her 20's. In addition, the more recent IQ scores received in 2007 are not indicative of mental retardation.

Finally, as urged by Defendant, Plaintiff's remote IQ scores should be discounted because

-12-

they are inconsistent with Plaintiff's most recent medical records, her extensive daily activities, and her past work activity.  See Cox v. Astrue, 495 F.3d 614, 618-19 (8th Cir. 2007)(ALJ properly discounted IQ scores in mentally retarded range, particularly in light of activities plaintiff acknowledged, including prior semi-skilled work as a certified nurse).

Based upon the foregoing, the Court believes that substantial evidence supports the ALJ's determination that Plaintiff's mental impairments did not meet or medically equal all of the requirements of Listing 12.05C.

### B.  Subjective Complaints and Credibility Analysis:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly evaluated Plaintiff's subjective complaints.  Plaintiff contends that her impairments were disabling. However, the evidence of record does not support this conclusion.

In the present case, the ALJ found that in activities of daily living, Plaintiff had mild

-13-

restriction. (Tr. 58). Plaintiff lived at home with her mother, reported no problems with personal care, was able to cook, clean, drive, spend time with friends, go out alone, and shop in stores. Although Plaintiff had taken several types of medication in previous years, during the relevant time period, she was taking no medication.

The ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC assessment. (Tr. 60). He found that Dr. Walz's psychological evaluation was an accurate assessment of Plaintiff's current mental capabilities and that the mental diagnostic evaluation provided by Dr. Kralik was consistent with his RFC determination. (Tr. 61-62).

The Court agrees and believes there is substantial evidence to support the ALJ's credibility findings.

### C.      RFC Assessment:

RFC is the most a person can do despite that person's limitations.  20 C.F.R. §404.1545(a)(1).  It is assessed using all relevant evidence in the record.  Id.  This includes medical records, observations of treating physicians and others, and the claimant's own description of her limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).  The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir.

-14-

2003).   "The ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC."  Id.

The ALJ found that Plaintiff had no exertional limitations and could perform unskilled work where interpersonal contact was incidental to the work performed.  The Court believes there is substantial evidence to support this finding.  There are no treatment records between 1999 and 2006, and then, Plaintiff was treated for an earache and numbness in her arm and jaw. Thereafter, in June of 2007, Plaintiff filed for SSI benefits.  The only remaining medical records included in the record are those of Dr. Walz, Dr. Kralik, and Dr. Gale.  The ALJ relied upon the opinions of Dr. Walz and Dr. Kralik, and Dr. Gale's opinion supported his findings.

Dr. Walz found that Plaintiff's social skills were fairly adequate; her speech was clear and intelligible; her intellectual functioning was thought to be in the mildly mentally retarded range, that Plaintiff would not be able to understand, remember, or carry out complex instructions, that Plaintiff was easily distractible; and that her speed of cognitive functioning was average. Dr. Kralik believed Plaintiff's inattentiveness was more the issue rather than Plaintiff's low cognitive functioning or mental illness, and believed Plaintiff was not functioning within or near the mentally retarded range of functioning.  She concluded that ADHD seemed to be the prominent condition about which Plaintiff complained, with associated social maturity and secondary gain issues.  Dr. Gale found that Plaintiff tested in the borderline range of intellectual functioning and, although her ADHD continued to be somewhat limiting, it would not preclude Plaintiff from performing unskilled work.

Unskilled work "needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  Hulsey v. Astrue, 622 F.3d 917, 922 (8th Cir. 2010) (quoting

-15-

20 C.F.R. §416.968(a)).  The ALJ's RFC assessment that Plaintiff could perform unskilled work is consistent with Plaintiff's impairments.  The Court therefore believes there is substantial evidence to support the ALJ's RFC findings.

### D.    Hypothetical Proposed to VE:

In the ALJ's first hypothetical posed to the VE, he stated:

> Please assume a younger individual with a limited education.  There's [sic] no exertional limitations.  The individual can perform unskilled work with interpersonal contact that's incidental to work performed.  Based upon that hypothetical, would the claimant's past relevant work as a housekeeper and a food prep worker be available?

(Tr. 38).  In response, the VE stated "Yes, sir."  (Tr. 38).  He stated that the previous work as a hospital housekeeper was rated as medium, SVP: 2, unskilled, and the food prep worker was medium, SVP: 2, unskilled.  (Tr. 37).  Upon further questioning by Plaintiff's attorney, the VE stated that most employers would allow up to one day a month of absence of being either sick or vacation time.  (Tr. 39).

The Court believes the hypothetical the ALJ posed to the VE fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole.  Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).  Accordingly, the Court finds that the VE's responses to the hypothetical questions posed by the ALJ constitute substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude her from performing her past relevant work as a housekeeper or food prep worker.  Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996)(testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

AO72A
(Rev. 8/82)

## V.     Conclusion:

Based upon the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of the undersigned's report and recommendation in which to file written objections pursuant to 28 U.S.C. §636 (b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 18th day of June, 2012.

/s/ *Erin L. Setser*

HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-17-